**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

RON BRADY, JR.,

     Petitioner,                          2:11-cv-00846-JCM-CWH

vs.

                                    **ORDER**

BRIAN E. WILLIAMS, *et al.*,

     Respondents.

_____/

Introduction

     This habeas corpus action is brought by Ron Brady, Jr., a Nevada prisoner serving prison sentences after being convicted of soliciting the murder of Anthony Gross, Megan Pierson Foley, and Jeremy Foley, witnesses in a high-profile Las Vegas murder case known as the "Titus-Ryan case." Brady's federal habeas corpus petition is before the court on its merits. The court will deny the petition, and will deny Brady a certificate of appealability.

Procedural History and Factual Background

     On March 5, 2007, Brady was indicted in Clark County, Nevada, on three counts of solicitation to commit murder. Exhibit 5.

     Brady filed a pre-trial state habeas petition, in which he alleged that hearsay evidence was improperly admitted in the grand jury proceedings, that the State failed to preserve certain evidence,

1   and that the State failed to disclose certain evidence.  Exhibit 13.[1]  After a hearing on June 12, 2007,

2   the state district court denied the petition.  Exhibits 15, 16.

3        Before trial, Brady filed two motions to compel the production of exculpatory documents and

4   other discovery material.  Exhibits 17, 18, 19, 20, 24, 26, 27.  The court ordered the parties to

5   exchange discovery pursuant to statute, and granted, in part, the second motion to compel.  Exhibits

6   18, 20, 36.  Brady also filed motions in limine and motions to suppress evidence.  Exhibits 25, 37,

7   39.  The court denied those motions.  Exhibits 1, 36, 48.

8        Brady's jury trial was conducted between January 28 and February 5, 2008.  *See* Exhibit 1.

9   The first witness called by the prosecution was Robert Wilson, a Las Vegas Metropolitan Police

10  Department (LVMPD) detective.  Exhibit 48, pp. 101-33.  Detective Wilson testified that he and

11  Detective Dean O'Kelley investigated the Titus-Ryan case, in which well-known bodybuilders

12  Craig Titus and Kelly Ryan were charged with murdering their personal assistant, Melissa James.  *Id*.

13  at 102-19.  Detective Wilson testified that Anthony Gross, Megan Pierson Foley, and Jeremy Foley

14  were witnesses in that case.  *Id*. at 110-14.  Detective Wilson testified that, ultimately, he and

15  Detective O'Kelley also investigated Brady's solicitation of murder case.  *Id*. at 119.

16       The next witness to testify was Rich Forbus, a lieutenant with LVMPD who worked

17  in the classification unit at the Clark County Detention Center (CCDC).  Exhibit 48, pp. 135-89.

18  Lt. Forbus testified that an inmate named Deen Cassim was housed in housing unit 2-M from August

19  29, 2005, until June 19, 2006.  *Id*. at 145-47.  Lt. Forbus also testified that Brady, in jail on previous

20  criminal charges, was housed in housing unit 2-M, and had ample opportunity for contact with

21  Cassim, beginning on March 3, 2006.  *Id*. at 147-51.  Prior to being moved to housing unit 2-M,

22  according to Lt. Forbus, Brady had been housed in housing unit 7-B.  *Id*. at 149.  Lt. Forbus testified

23  that Craig Titus had also been housed in housing unit 7-B, and that Brady and Titus were housed

24  together in that unit from February 13 to March 3, 2006.  *Id*. at 151-54.

25

26

---

[1]  In this order, the exhibits referred to by exhibit number, in the form "Exhibit ___," are those filed by respondents and found in the electronic record at ECF Nos. 20 through 27.

The prosecution then called Theresa Fragola as a witness.[2]  Exhibit 48, pp. 190-217.  Fragola testified that she dated Brady in early 2006. *Id.* at 191-92.  She testified that she was dating Brady in April and May, 2006, when Brady was released from jail. *Id.* at 192.  She testified that Brady talked to her about his time in jail, and that he was particularly excited about befriending Titus. *Id.*  Fragola testified that Brady talked to her about the details of Titus' murder case. *Id.*  Fragola testified that Brady spoke to Titus on the telephone on a daily basis. *Id.* at 193-94.  Fragola testified that Brady also spoke with another CCDC prisoner on a regular basis, but she did not know that prisoner's name and never spoke to him on the telephone. *Id.* at 194.  Regarding Brady's telephone calls with that prisoner, Fragola testified as follows:

> Q.    After the Defendant talked to that person – after the Defendant talked to that other person that you never talked to, did the Defendant tell you what their conversations were about?
>
> A.    Yes.
>
> Q.    What did he tell you?
>
> A.    He told me that he was helping him, I guess, get a list of people together that was somewhat – I guess a witness to Craig Titus' case.
>
> Q.    Did he tell you why he was getting a list of people together?
>
> A.    Yes.
>
> Q.    What did he tell you?
>
> A.    He told me that they were going to hire somebody to have them killed.
>
> Q.    Initially when he said, getting together a list of people to have some people killed, did you take him seriously?
>
> A.    Not at first.
>
> Q.    At first what did you think?
>
> A.    I just -- I don't know.  I thought I just -- I didn't take it seriously.  I didn't believe it.

---

[2]  Fragola's name is spelled in different manners in the record (in the transcript of the trial, for example, it is spelled "Fragol" (*see* Exhibit 48, p. 190)).  The court adopts the spelling used by Brady in his habeas petition and the respondents in their answer.

1          Q.      At some point did something happen that made you take it seriously?

2          A.      Well, his -- yeah.  He became more uptight and tense.  And he even --
it became serious when he threatened me if I told anybody he would kill me.

3
           Q.      He tells you we're going to eliminate these witnesses.  You see his
4     body language, he demeanor, things like that start to change?

5          A.      Yes.

6          Q.      At some point he makes a statement to you that if you tell anybody,
what's going to happen to you?
7
           A.      I'll be next on the list.  I'll be killed.
8
           Q.      Did you take that seriously?
9
           A.      I did.
10
Id. at 194-96; see also id. at 203-04 (on cross-examination).  Regarding Brady's relationship with

11
Titus, Fragola testified as follows:
12
           Q.      Can you describe for me how the Defendant was when he talked about
13     Craig Titus?

14         A.      He talked about him like he glorified him.

15         Q.      What do you mean?

16         A.      Like he wanted to almost be like him maybe.  Like he -- it was bizarre.
He was obsessed with him, I think.
17

18    Id. at 196; see also Exhibit 51, pp. 27-28 (testimony of Detective O'Kelley); Exhibit 52, pp. 104-06,

19    145-49 (Brady's testimony).  Fragola testified that she went with Brady to a meeting with a woman,

20    and Brady gave the woman an envelope.  Exhibit 48, pp. 197-202.

21          On his cross-examination of Fragola, defense counsel questioned Fragola as follows

22    regarding domestic violence between Fragola and Brady:

23         Q.      Isn't it true that Mr. Brady had you arrested for hitting him over the
head with a bottle?
24
           A.      That's what he said, yes.  He did have me arrested for that.
25
           Q.      You actually went to jail for that, didn't you?
26
           A.      I did.

4

Q.      And you were actually convicted of domestic battery against Mr. Brady, weren't you?

A.      Yes, but they cleared it.  It just got cleared a couple months ago. I didn't have to attend any domestic classes or anything.

Q.      You don't hold that against him, do you?

A.      No.  I mean -- I didn't -- I don't have it on my record.

THE COURT:  Let her finish her answer.

BY MR. SCHWARZ [defense counsel]:

Q.      If you didn't hold that against him, that he had you arrested?

A.      Well, at the time, yeah, I was angry.  Yeah, it was couple years back. At that point I was angry about that, but that was three years ago.

Q.      When did you get out of custody?

A.      I was only in jail like 6 days.

Q.      When was that?

A.      That was in 2005, maybe.

Q.      You weren't in custody as a result of that allegation as recently as 6 months ago?

A.      Yes, because I had a warrant for it.  And then I went back in and I did 6 days, maybe, a little over a week.  Then I went to court and they cleared it.

Q.      Did you hit him over the head with a bottle?

A.      No.

Q.      So he lied about it?

A.      Yes.

Q.      Got you arrested for domestic battery?

A.      Yes.

Q.      And you were upset?

A.      Yes, at the time.  That was 3 years ago.

*Id.* at 206-07.  On his redirect examination, the prosecutor questioned Fragola as follows, regarding the domestic violence between her and Brady:

5

1    Q.    Just so we're clear, is it your testimony that you're not here making something up against this guy because you are mad he got you arrested?

2

3    A.    Right.  That's not why I'm here.

     Q.    You understand you're under oath?

4

5    A.    Yes.

     Q.    Did anyone ever tell you what you needed to say today?

6

7    A.    No.

     Q.    Is it your testimony that what you just testified to is in fact the truth?

8

9    A.    Yes.

     Q.    About the things that he said to you?

10

11   A.    Yes.

     Q.    I want to ask you about the things he did to you.  Mr. Schwarz asked you about when the allegation was made that you hit him over the head with a bottle.

12   Remember that?

13

14   A.    Yes.

     Q.    Would you characterize your relationship as one where a lot of drugs were used?

15

16   A.    Yes.

17   Q.    Did both of you use drugs?

18   A.    Yes.

19   Q.    Have you gone through treatment for that?

20                              *     *     *

21   A.    No.  I just quit.

22                              *     *     *

23   Q.    Prior to March 2007, when you were in the relationship where you used drugs with the Defendant, would you characterize your relationship as violent?

24

25   A.    Extremely.

     Q.    From your opinion of the relationship, who was the violent one in the relationship?

26

6

1       A.      Ron.

2       Q.      Did Ron do anything to hurt you physically?

3       A.      Yes.

4       Q.      What did he do?

5       A.      He beat me almost on a daily basis.  He beat me with pipe wrenches,
tire iron.  He'd shock me until I was unconscious.  He broke my neck.  He broke my
6  back.  He ran me over with his father's vehicle, which broke my pelvis bone and my
tailbone.  He broke my nose.  He blackened my eyes.  He tied me up with duck tape
7  and left me in a bathroom.

8       Q.      Would you describe him as having, in your experience, a
predisposition to violence?

9

10      A.      Yes.

      Q       Are any of those incidents you talked about documented?

11

      A.      Yes.

12

      Q.      Did you call the cops?

13

      A.      Yes.

14

      Q.      On September 14, 2004 did you call the police?

15

      A.      Yes.

16

      Q.      Did police come and see you at Desert Springs Hospital when you had
17  cuts on your arms, bruises throughout your body, two black eyes and a swollen head?

18      A.      Yes.

19      Q.      Did you have to undergo medical procedures regarding the breaking of
your arm and the breaking of your neck?

20

      A.      Yes.

21

      Q.      On November 10, 2005, did you call the police regarding a battery
22  involving Mr. Brady?

23      A.      Yes.

24      Q.      Was that because he hit you with a closed fist to your head and upper
body area?

25

      A.      Yes.

26

7

1          Q.      Did doctors actually see you on that time and confirm both your nose and your ribs were broken, in addition to the arm and neck you mentioned earlier?

2

          A.      Yes.

3

4  *Id.* at 207-11.  The prosecutor then introduced into evidence a photograph that was taken for

5  purposes of a state-issued identification, which showed Fragola with a black eye that she testified

6  Brady gave her.  *Id.* at 211-12.  The prosecutor continued his redirect examination of Fragola:

7          Q.      Defense asked you about whether or not you were convicted of a domestic battery charge?

8

9          A.      Yes.

          Q.      Was the Defendant ever convicted of anything like that?

10

          A.      Yes.

11

12          Q.      In fact, at that time he was in jail when he met Craig Titus and Deen Cassim what was he in jail for?

13          A.      I believe at the time it was when my neck was broken.

14          Q.      Did he plead guilty to that?

15          A.      He did.

16  *Id.* at 212.  On his re-cross examination of Fragola, defense counsel questioned her further about the

17  domestic violence between her and Brady:

18          Q.      Okay, Ms. Fragol[a], you'll have to forgive me, my client broke your neck?

19

20          A.      Yes.

          Q.      And he was convicted of a misdemeanor domestic battery?

21

          A.      Yes.

22

23          Q.      Okay.  All right.  That's great.  Now you told Mr. Tomsheck [the prosecutor] all this stuff he did, you know, that my client -- let me ask you this.  He broke your neck, right?

24

          A.      Yes.

25

          Q.      He broke your arm?

26

          A.      Yes.

1   Q.   He broke your back?

2   A.   Yes.

3   Q.   And were you ever treated for any of those injuries?

4   A.   Yes.

5   Q.   Do you have any medical records to show that your back --

6   A.   Not on me, no.  But the hospital and the police officers have them.

7   Q.   You told Mr. Tomsheck, yes, where you went to the hospital, right?

8   A.   Yes.

9   Q.   If there were medical records or x-rays to show that you had broken
bones, they could have been provided, yes?

10

11   A.   I don't know.  I'm not in charge of doing that.  I'm sure they could
have been.

12   Q.   Now, was my client ever convicted of domestic battery?

13   A.   On me or other people?

14   Q.   On you?

15   A.   Well, he pleaded guilty to breaking my neck, I don't know.

16   Q.   A misdemeanor?

17   A.   And what is your question, so that would be, yes.

18   Q.   My question is was he threatened with any felony crime as a result of
any of these allegations that you're making, to the best of your knowledge?

19

    THE COURT:   Charged with?

20

    MR. SCHWARZ:   Yes.

21

    THE WITNESS:  He got arrested on them.  I don't know if they ever went
22  through to anything or if he got off.

23                          *   *   *

24   Q.   And to the best of your knowledge he was convicted of a domestic
battery misdemeanor not a felony?

25

    A.   I suppose so.  I don't know.

26

    Q.   For breaking your neck?

9

1          A.     I guess, yes.

2     *Id*. at 213-15.  On his further re-direct examination of Fragola, the prosecutor questioned her as

3     follows:

4          Q.     You're talking about what he was ultimately convicted of, right?

5          A.     Yes.

6          Q.     Would you agree with me that at some point you didn't want to testify

7     against him?

8          A.     Yes.

      Q.     Why?

9          A.     Because he said he would kill me.

10         Q.     When he was in custody on that charge that he pled guilty to a

11    misdemeanor on are you aware that he was in fact arrested and charged with battery
      with a deadly weapon with substantial bodily harm?

12         A.     Yes.

13         Q.     That's a felony, isn't it?

14         A.     Yes.

15         Q.     And he [copped] a plea to a misdemeanor?

16         A.     yes.

17         Q.     And part of the reason he got that plea is because you didn't want to

18    show up to court?

19         A.     Yes.

20         Q.     You had a temporary protective order against him, right?

21         A.     Yes.

22         Q.     You didn't want him near you?

23         A.     Yes.

24    *Id*. at 215-16.  On further cross-examination, defense counsel questioned Fragola as follows:

25         Q.     ... Isn't it true that the reason you agreed to the deal and didn't want to
      come testify is because you knew that my client had medical proof documenting you

26    didn't have any fractures?

1          A.     No.  And I have the x-rays at home.

2                                     *     *     *

3          Q.     ... You don't harbor any animosity towards my client, do you?

4          A.     No.  I'm pretty much better on with my life now.

5    *Id*. at 217.

6          The day after Fragola testified, the defense filed a document entitled "Supplement

7    Discovery."  Exhibit 49.  That document included material that defense counsel stated was received

8    from Brady's family on the evening after Fragola testified, and that defense counsel alleged had not

9    been disclosed by the prosecution.  *See* Exhibit 49, p. 1; *see also* Exhibit 50, pp. 7-8.  Defense

10   counsel stated that if he had those documents before, he would have been able to use them to

11   impeach Fragola.  Exhibit 50, pp. 7-8.  Defense counsel requested that the State be required to re-call

12   Fragola, or that he be provided contact information so that he could call her during the defense case

13   in chief.  *Id* at 8-16.  The court denied that request.  *Id*. at 16-21.

14         The State's next witness was Deen Cassim.  Exhibit 48, pp. 218-51; Exhibit 50, pp. 27-127.

15   Cassim testified that he was from England, that he was in Las Vegas mostly to play poker, and that

16   in Las Vegas he was arrested and charged with various crimes.  *Id*. at 217-19.  Ultimately, he pled

17   guilty to conspiracy to commit robbery, attempted robbery, and attempted kidnapping.  *Id*. at 217-20.

18   After he pled guilty to those charges, he was housed at CCDC, where he was, in August 2005, placed

19   in housing unit 2-M.  *Id*. at 221.  In March 2006, Cassim met Brady in housing unit 2-M.  *Id*. at 224-

20   25.  Cassim testified that, at some point, Brady began talking about the Titus-Ryan case, and about

21   potential witnesses in that case.  *Id*. at 227-28.  Cassim testified:

22         Q.     At some point does he [Brady] talk to you about a way you can help
           him out?

23
           A.     Yes.
24
           Q.     What does he talk to you about?
25
           A.     Arranging for one of -- at that point one of the witnesses, to basically
26         not to testify.  To, you know, kill him, or whack him, I guess was the word at that
           point.

*Id*. at 228-29.  Cassim testified that at first he believed Brady might be a police officer, but

eventually began to believe that he was not.  *Id*. at 229-31.  Cassim testified that he talked to Brady

about eliminating the witnesses, but that he was never really going to facilitate someone getting

killed; rather, he was thinking about going to the police.  *Id*. at 231.  Cassim testified that he was

soon talking to Brady every day for several hours each day.  *Id*. at 232.  Cassim testified that he told

his attorney and his girlfriend about his conversations with Brady.  *Id*. at 233-38.  Cassim testified

that a few days after he met Brady he was sentenced, and he received a sentence of three and a half to

twelve years in prison.  *Id*. at 238; *see also* Exhibit 50, p. 80.  Cassim testified that he decided to tell

his attorney to talk in depth with the prosecutor on the Titus-Ryan case about his conversations with

Brady, and to tell him that he would possibly work with LVMPD on the case.  Exhibit 48,

p. 239.  Cassim testified that he then spoke again to his attorney about his conversations with Brady,

and provided detailed information that he had not seen in the news media.  *Id*. at 239-41; *see*

*also* Exhibit 51, pp. 81-82 (testimony of Detective O'Kelley).  Cassim then received visits from

Detectives O'Kelley and Wilson, on March 22 and 23, 2006.  Exhibit 48, pp. 241-42.  In his second

meeting with the detectives, he told them that it was Brady who had given him information about

wanting to kill witnesses in the Titus-Ryan case.  *Id*. at 243.  Cassim testified that he never received

any promise from anyone that he would receive anything in return for his help on the Titus-Ryan

case.  *Id*. at 243-45.  Cassim testified that he began to work with the LVMPD, with respect to

Brady's solicitation of murder.  *See id*. at 245-51.  By this point, Brady had been released from jail,

and Cassim stayed in touch with Brady by telephone.  *Id*.  Detective Kelley would secretly monitor

telephone calls between Cassim and Brady; later, some phone calls were made on a system that

recorded them with the knowledge of both callers, and those calls, too, were monitored by the

detectives.  *Id*.; *see also* Exhibit 50, pp. 113-14, 123-24.  Cassim testified that he and Brady agreed

upon code that they would use to discuss the witnesses in the Titus-Ryan case, and the plan to kill

them.  Exhibit 48, pp. 245-47; *see also* Exhibit 50, p. 168 (testimony of Detective O'Kelley).  The

telephone conversations between Cassim and Brady continued, almost daily, with the two discussing

1   details of the plan to kill Gross, Pierson Foley, and Foley, and with the detective listening in on those

2   conversations and with some of them recorded.  Exhibit 50, pp. 28-32.  Cassim and Brady had

3   hundreds of such telephone conversations.  *Id*. at 118.  In the course of those discussions, Cassim

4   and Brady arranged for Brady to meet with associates of Cassim -- a person referred to as "Edison,"

5   and a girlfriend or ex-girlfriend -- to deliver payment for the murders as well as information

6   identifying the witnesses to be killed.  *Id*. at 32-36.  Brady did not show up for the first three

7   arranged meetings, and Cassim believed that he lied about why he did not show up.  *Id*. at 36-44.

8   After Brady did not show up for the third arranged meeting, Cassim called Brady and expressed

9   anger about his failures to show up.  *Id*. at 45.  The prosecution then asked Cassim about times when

10  Cassim suggested to Brady that he didn't have to go through with the hired killings or that there

11  might be alternative courses of action:

12          Q.      As part of -- when you're playing the part, do you periodically
                throughout these phone calls suggest to him that he doesn't have to go through with
13          this?

14          A.      Yes.

15          Q.      Do you suggest another alternative if he wants to get the job done?

16          A.      Yes.

17          Q.      What do you tell him he can do?

18          A.      The first time I said we don't have to kill him.  We can just let my
        people from LA talk to them, maybe just pay them some money not to turn up in
19      court.  Just -- because he said they were drug addicts, or, you know, druggies or
        something.

20          Q.      You give him an option of --

21          A.      Not to kill them.

22          Q.      What's his response to that?

23          A.      No.  It has to be a permanent vacation.

24          Q.      At some point do you suggest someone other than yourself facilitating
25      them being killed?

26          A.      Yes.  I said I want to pull out of the deal.  Fred is not going to deal
        with you.  Edison is not going to deal with you.  The deal is done.  I think you should

1    go to -- you know, cost you $5,000 go to some gangsters in downtown Las Vegas and
2    something and have them do the job.  It would be a lot easier for you, because dealing
     with me is a lot more money.

3            Q.      What was his response to that?

4            A.      No, I want you to do the job, because I know it will be done
     professionally.  Doing it the other way, it wouldn't be done.  The bodies would be
5    found.

6            Q.      There had been some communication between the two of you that he
     didn't want the bodies found?
7
             A.      Right.
8
                                            *     *     *
9
             Q.      You talked to him immediately before the scheduled meeting?
10
             A.      Yes.
11
             Q.      During that conversation, did you give him options in lieu of showing
12   up for the meeting?

13           A.      Yes.

14           Q.      What did you tell him?

15           A.      I told him basically about the credibility with my girlfriend.  I didn't
     want him to let her down.  If he didn't have the money, be honest with me.  It's okay.
16   I'm a cool guy.  You don't have to lie to me anymore.  Be honest.

17           If you don't have the money or you're scared to turn up, tell me now.  You
     don't have to turn up if you're not going to.  I would rather let her know not to be
18   there, then be there and him not turn up.

19           Q.      What was his response to that?

20           A.      No, I'm turning up.  I'm on my way now.

21   *Id.* at 45-49; *see also id.* at 115-20; *see also* Exhibit 51, pp. 11-16 (testimony of Detective O'Kelley).

22   After Brady's third failure to show up for the arranged meeting, Cassim gave Brady thirty days, until

23   May 18, 2006, to follow through with the plan.  Exhibit 50, p. 51.  They then arranged a fourth

24   meeting, on May 17, 2006.  *Id.* at 53.  Brady was then to meet with Cassim's girlfriend -- actually

25   undercover police officer Yasenia Yatomi -- and provide her with $1000 in cash and identifying

26   information regarding the people to be killed.  *Id.* at 54-55.  That meeting did take place.  *Id.* at 55-

                                              14

57.  During the meeting, Cassim was on the telephone with Brady, and Detective O'Kelley was secretly monitoring the call.  *Id*.  Brady delivered $500 of the agreed-upon $1000.  *Id*.  There was then another meeting set for two days later, May 19, 2006, and at that second meeting, again with Cassim on the telephone and Detective O'Kelley secretly monitoring the call, Brady delivered another $500 to the woman purporting to be Cassim's girlfriend.  *Id*. at 57-58.   After those meetings, according to Cassim's testimony, Cassim spoke on the telephone twice with Brady about why the killings had not been done:

> Q.     Do you call him and communicate with him about whether or not it has been done?
>
> A.     Yes.
>
> Q.     What do you tell him?
>
> A.     That it hasn't -- it hasn't been done.  Fred wants to do all three the same day, because soon -- if he did just one, then within 24 hours or so homicide would know what's going on or assume that something is going on.  Because if it was a chance that Anthony Gross was found murdered, then immediately people would be put into protective custody.  So I said Fred wants to do all three the same day.  He wants to come in from LA and do the job and leave and get out.
>
> *     *     *
>
> Q.     After that point in time do you then contact him again and communicate a reason Fred hasn't yet carried out the hit?
>
> A.     Yes.
>
> Q.     What is that reason?
>
> A.     That he couldn't -- one's not the problem.  He can get to one.
>
> Two and three, he can't -- he can get to two and three, but two and three have family around them a lot of times.  So he wants to do two and three without any witnesses.  he can't do two and three with people around, so he hasn't don't it as yet.
>
> Q.     Do you explain to the Defendant that in this scenario Fred found himself in, if he killed the people that were paid for to be killed he would have to kill the witnesses as well?
>
> A.     Right.
>
> Q.     Did you explain that he'd actually have to kill six people?

15

1    A.    Yes.  I tell Brady that Fred is not going to kill six people.  He's only
2    been contracted to do three.  He does three.  He's not going to do the other three.

     And he hasn't been paid for the other three.  And Brady says, well, I don't care
3    haw many you've got to kill to get to 1, 2, 3, kill them all and Titus will cover you on
     the back end.  Money is not a problem.  I promise you.
4
                                              *    *    *
5
6    Q.    Do you remember having a conversation with the Defendant about
     what would happen if other people were around and had to be killed?

7    A.    Yes.

8    Q.    Does he give you a number of people he doesn't care if are killed?

9    A.    Yes.

10   Q.    What number is that?

11   A.    Ten.

12   *Id.* at 59-61; *see also* Exhibit 51, pp. 51-54 (testimony of Detective O'Kelley).  Cassim testified that,

13   shortly thereafter, he stopped communicating with Brady.  Exhibit 50, p. 61.  Cassim was then

14   rensentenced to probation, and was deported to England.  *Id.* at 61-64.

15   The prosecution's next witness was Yasenia Yatomi, an LVMPD officer.  Exhibit 50,

16   pp. 130-50.  Yatomi was the undercover officer who posed as Cassim's girlfriend and met with

17   Brady on May 17 and 19, 2006.  *Id.* at 131-32.  Yatomi described the role she played, and her

18   meetings with Brady.  *Id.* at 131-39.  Yatomi wore a wire to record the meetings, and the meetings

19   were video recorded as well.  *Id.* at 135-36.  At the meetings, Yatomi received from Brady, in

20   envelopes, a total of $1000, identifying information regarding the witnesses Brady sought to have

21   killed, a photograph of Gross, and an address.  *Id.* at 133-47; *see also* Exhibit 52, p. 40 (testimony of

22   Detective O'Kelley).

23   The prosecution then called as a witness Dean O'Kelley, the LVMPD detective who, along

24   with detective Wilson, investigated Brady's case.  Exhibit 50, pp. 150-78; Exhibit 51, pp. 4-89;

25   Exhibit 52, pp. 3-83.  Detective Kelley testified about how he initially received information from

26   Cassim regarding Brady's murder-for-hire plan, and about his first meetings with Cassim.  Exhibit

50, pp. 160-72.  Detective Kelley went on to explain how he could listen in on telephone calls

between Cassim and Brady, and about how some such telephone calls could be recorded.  *Id.* at

169-72.  Detective O'Kelley testified concerning the substance of several calls between Brady and

Cassim, between Brady and Titus, and between Brady and members of his family.  *Id.* at 172-77;

Exhibit 51, pp. 5-60.  For example:

> Q.      Is there talk between the Defendant and Deen Cassim about how the hit is to be paid for?
>
> A.      Yes.
>
> *      *      *
>
> Q.      Is there talk about how Edison is going to identify the people who are to be killed?
>
> A.      Yes.
>
> Q.      How is he going to do that?
>
> A.      That Mr. Cassim told -- had a conversation with Mr. Brady about placing a picture of Mr. Gross -- or Anthony -- and information related to him.  Also information related to his hang-outs -- where he hangs out.
>
> Q.      Identifying information and photographs?
>
> A.      Yes.
>
> *      *      *
>
> Q.      After the first missed meeting in a monitored conversation between Deen Cassim and the Defendant is there conversations about whether or not they were going to continue to go through with it?
>
> A.      Yes.
>
> Q.      What does the Defendant say?
>
> A.      That he wanted to still get the job done.  To get it done.
>
> *      *      *
>
> Q       During that call there is a conversation about a couple of different topics, would you agree?
>
> A.      Yes.
>
> Q.      One of which is pictures?

1          A.     Right.

2          Q.     Do you have an understanding of what is meant by the conversation
regarding pictures?

3          A.     Yes.

4          Q.     What is that?

5          A.     Photographs of the intended targets of the murder for hire.

6          Q.     After the job is done?

7          A.     Excuse me -- there was an agreement between Mr. Brady and
8    Mr. Cassim that a photograph would be taken at least of what would eventually be
number 1, Anthony Gross. And that would then be provided later to him as evidence
9    that the killing had taken place.

10         Q.     Was it to be provided to anyone else as evidence that the killing had
taken place?

11

12         A.     There was a suggestion that even in that call that Mr. Titus would be
provided one of those pictures, but Mr. Brady said both of those pictures should go to
him.

13

14   Exhibit 50, pp. 175-77; Exhibit 51, pp. 7, 39-40. Detective O'Kelley testified about the arranged

15   meetings between Brady and undercover agents that Brady did not show up for. Exhibit 51,

16   pp. 5-11, 16-21. And, detective O'Kelley also testified about listening in when Cassim and Brady

17   were on the telephone during the two meetings between Brady and the undercover agent that

18   occurred on May 17 and 19, 2006. Exhibit 51, pp. 43-49. Detective O'Kelley testified about a

19   telephone call between Brady and Titus on the afternoon of May 17, 2006, after Brady's first meeting

20   with the undercover agent:

21         Q.     Obviously, it's your position that the intent is to eliminate witnesses in
the Craig Titus trial?

22

23         A.     Yes.

24         Q.     Does the Defendant have a conversation with Craig Titus on the
afternoon of the 17th of May after the meeting in which he discusses how what he's
done is going to effect Craig Titus' case?

25

26         A.     Yes, he did.

18

1    Q.    What did he say?

2    A.    He said what he had done today was going to make sure that he got out
     in July.

3

4    Exhibit 51, p. 46.  Detective O'Kelley also testified about a telephone call between Brady and Titus

5    on May 20, 2006, the day after Brady's second meeting with the undercover agent:

6    Q.    That call is made the day after the second drop is made?

7    A.    Yes.

8    Q.    At that time the Defendant believes, by talking to Deen Cassim,
     witnesses are going to be eliminated?

9

10   A.    Yes.

     Q.    After the second drop is complete the understanding at that point
11   between Deen Cassim and the Defendant is the job is going to be completed, correct?

12   A.    Yes.

13   *Id.* at 50-51.  Detective O'Kelley also testified regarding a recorded telephone call made by Brady to

14   his sister, Kim Brady, from jail, the day after he was arrested:

15   Q.    Did you hear when Kim Brady asked the Defendant, is this a strong
     case against you?

16   A.    Yes.

17
     Q.    What is the Defendant's response?
18
     A.    Oh, yeah, it's strong.
19
     Q.    Does he say anything about the nature of the charges?
20
     A.    He said it's just solicitation.
21

22   *Id.* at 60.

23   The State rested its case (Exhibit 52, p. 84), the defense case began, and Brady testified.

24   Exhibit 52, pp. 104-213.  Brady testified about meeting Titus in jail.  *Id.* at 104-06 ("It's kind of

25   awesome that Craig Titus from body building magazines was in our module.... He's really an

26   interesting guy to meet.... He's cool.").  Brady testified that he and Titus formulated a plan to

discredit witnesses against Titus by having them arrested for narcotics offenses. *Id*. at 107-09, 114. Brady testified that he was then moved to housing unit 2-M, where he met Cassim, and spoke with him about the Titus-Ryan case. *Id*. at 109-13. He testified that Cassim offered to help with the plan to discredit witnesses, or to pay witnesses to not testify. *Id*. at 114-18. Brady testified about the calls he received from Cassim after he was released from jail, and the meetings arranged wth Cassim's associates, claiming that the plan between them at that point, and their aim in their calls and the meetings, was to pay witnesses to not testify in the Titus-Ryan case. *Id*. at 119-35. Brady testified that he did not show up for the first three arranged meetings because by then he did not want to be involved in the plan anymore. *Id*. at 122-28. Brady testified that he felt threatened by Cassim, and was afraid to pull out of their plan to pay witnesses to not testify. *Id*. at 127-28. Brady testified that the plan he had with Cassim was never to kill anyone. *Id*. at 131. He testified: "If this guy once mentioned killing or harming, I would have gone straight to the police." *Id.* Brady testified that in a statement he gave after his arrest, he acknowledged that he knew that Cassim was talking about murdering witnesses in the Titus-Ryan case, and he attempted to explain that as follows:

> Q.     And during the recorded part of the conversation you do acknowledge, do you not, that you knew that Cassim was talking about murdering these people?
>
> A.     After they told me that Deen Cassim said that, yeah. They were so adamant about us talking about it that I said, okay. All right. That's what we're talking about. Right. That's what we're talking about.
>
> I mean I tried to tell them we were never discussing murder because if I had known we were discussing murder, I would have come forward so fast with my family 'cause I though my family was in harm's way that I would have come forward to the police and told them, this guy is, something's going on with this guy.

*Id*. at 140-41.

The next witness called by the defense was Virgil Smartwood, a corrections sergeant at CCDC. Exhibit 52, pp. 213-22. Sgt. Smartwood testified about Brady's housing in isolation at CCDC after he was arrested for solicitation of murder, and about inquiries he made about whether there was a reason Brady should stay in such a housing classification. *Id*.

Next, the defense called as a witness Thomas Bachman, a narcotics detective with LVMPD.

Exhibit 52, pp. 223-42.  Detective Bachman testified about Brady contacting LVMPD and seeking to provide information to LVMPD about narcotics crimes.  *Id.*  Detective Bachman testified that on one occasion Brady attempted to provide LVMPD information regarding an individual involved in the Titus-Ryan case.  *Id.* at 228-29, 238-39.  He testified that nothing ever came of that, that the information was generally not useful, and that Brady was "[v]ery very unreliable."  *Id.* at 228-29, 240-41.  Detective Bachman testified about a report he prepared regarding his contacts with Brady.  *Id.* at 229-31.

The defense then called as a witness Brady's father, Ronald Brady, Sr.  Exhibit 52, pp. 243-89.  He testified about telephone calls between him and Cassim.  *Id.* at 243-59, 285-87.  The defense then rested its case.  *Id.* at 289-90.

The prosecution, in its rebuttal case, recalled Detective O'Kelley to the stand.  Exhibit 54, pp. 15-25.  Detective O'Kelley then testified about telephone conversations between Brady and his father in which Ronald Brady, Sr., discussed possibilities for them to profit financially from Brady's case, either by book or movie deals, or by prosecuting a malicious prosecution action.  *Id.* at 15-18.  Detective O'Kelley also testified about telephone conversations between Brady and his father in which they discussed possible defenses in Brady's case, including the argument that Brady was only trying to discredit witnesses in the Titus-Ryan case, not have them killed.  *Id.* at 18-21.  Detective O'Kelley's testimony concluded the presentation of evidence at the trial.  *Id.* at 25.

The court then gave the jury instructions, including instructions regarding the defense of entrapment.  *Id.* at 26-39.

In his closing argument, defense counsel primarily argued that the defendant had been entrapped.  *Id.* at 71-97.

On February 5, 2008, the jury returned its verdicts, finding Brady guilty of three counts of solicitation to commit murder.  Exhibit 55.

Following the verdict, Brady litigated motions seeking orders compelling production of

documents regarding Fragola, and the court granted those orders.  Exhibits 57, 58, 60, 61, 62, 63, 64, 65, 66.  On May 29, 2008, Brady filed a motion for mistrial or, in the alternative, for new trial.  Exhibit 67, 69, 71, 72, 73.  That motion was based, in part, on Brady's discovery of information that he contends refutes Fragola's testimony about the injuries Brady inflicted upon her.  *Id*.  The motion was denied on July 24, 2008.  Exhibit 77.  On August 15, 2008, Brady filed, in the Nevada Supreme Court, an application for writ of prohibition, or, in the alternative, writ of mandamus together with a motion for stay of proceedings in the district court.  Exhibits 79, 80, 81.  The petition and motion for stay were denied by the Nevada Supreme Court on August 15, 2008.  Exhibit 82.

On September 2, 2008, a judgment of conviction was entered, adjudging Brady guilty of three counts of solicitation to commit murder, and sentencing him as follows:  on the first count, 48 to 150 months in prison; on the second count, 48 to 150 months in prison, to run concurrent to the sentence on count one; on count three, 48 to 150 months in prison, to run consecutive to the sentences on counts one and two.  Exhibit 83.

Brady appealed.  Exhibit 85.  On appeal, Brady asserted:  that the police used an informant to illegally listen to his telephone conversations without a warrant; that the State failed to collect and preserve exculpatory evidence; that the State violated the rule of *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide impeachment evidence to the defense; and that there was juror misconduct.  In an Order of Affirmance entered on March 1, 2010, the Nevada Supreme Court affirmed the judgment of the district court.  Exhibit 112.  Brady petitioned the Nevada Supreme Court for a rehearing.  Exhibit 113.  That petition was denied.  Exhibit 114.  The Nevada Supreme Court issued its remittitur on May 25, 2010.  Exhibit 115.

On May 24, 2011, Brady filed, in this court, a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 1).

Respondents filed a motion to dismiss (ECF No. 19).  On September 11, 2012, the court

granted that motion in part and denied it in part (ECF No. 30).  The court dismissed ground I of

Brady's petition; the court denied the motion to dismiss with respect to ground II.

On October 30, 2012, respondents filed an answer (ECF No. 35), responding to the remaining

claim in Brady's petition, ground II.  On November 30, 2012, Brady filed a reply

(ECF No. 40).

Brady's habeas petition is now before the court with respect to the merits of ground II, the

one claim remaining in the petition.

Standard of Review

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254

enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply.  *See Lindh v.*

*Murphy,* 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000),

overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003).  28 U.S.C. § 2254(d) sets

forth the primary standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the

meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set

forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result

different from [the Supreme Court's] precedent."  *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)

(quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694

23

1   (2002)).

2       A state court decision is an unreasonable application of clearly established Supreme Court

3   precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct

4   governing legal principle from [the Supreme Court's] decisions but unreasonably applies that

5   principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S.

6   at 413).  The "unreasonable application" clause requires the state court decision to be more than

7   incorrect or erroneous; the state court's application of clearly established law must be objectively

8   unreasonable.  *Id.* (quoting *Williams*, 529 U.S. at 409).

9       The Supreme Court has further instructed that "[a] state court's determination that a claim

10  lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

11  correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786

12  (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has stated

13  "that even a strong case for relief does not mean the state court's contrary conclusion was

14  unreasonable." *Id.* (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131

15  S.Ct. 1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly

16  deferential standard for evaluating state-court rulings, which demands that state-court decisions be

17  given the benefit of the doubt" (internal quotation marks and citations omitted)).

18      The state court's "last reasoned decision" is the ruling subject to section 2254(d) review.

19  *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010).  If the last reasoned state-court decision

20  adopts or substantially incorporates the reasoning from a previous state-court decision, a federal

21  habeas court may consider both decisions to ascertain the state court's reasoning.  *See Edwards v.*

22  *Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

23      If the state supreme court denies a claim but provides no explanation for its ruling, the federal

24  court still affords the ruling the deference mandated by section 2254(d); in such a case, the

25

26  petitioner is entitled to federal habeas corpus relief only if "there was no reasonable basis for the

24

1    state court to deny relief."  *Harrington*, 131 S.Ct.  at 784.

2    Analysis

3          In ground II of his habeas petition, Brady claims that the State violated his federal

4    constitutional rights, as delineated in *Brady v. Maryland*, 373 U.S. 83 (1963), by not disclosing to

5    the defense information that could have been used to impeach Fragola's testimony regarding injuries

6    Brady inflicted upon her.  Petition for Writ of Habeas Corpus (ECF No. 1), pp. 6-7; *see also*

7    Memorandum in Support of Federal Habeas Corpus Relief (ECF No. 1), pp. 3-6, 56-82.

8          In *Brady*, the Supreme Court held that "[t]he suppression by the prosecution of evidence

9    favorable to an accused upon request violates due process where the evidence is material either to

10   guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373

11   U.S. at 87.  *Brady* violations have three components: "The evidence at issue must be favorable to the

12   accused, either because it is exculpatory, or because it is impeaching; that evidence must have been

13   suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*

14   *v. Greene*, 527 U.S. 263, 281-82 (1999).  "The terms 'material' and 'prejudicial' are used

15   interchangeably in *Brady* cases." *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir.2002)

16   ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.'

17   Thus, for *Brady* purposes, the two terms have come to have the same meaning.").  Evidence is

18   material under *Brady* "when there is a reasonable probability that, had the evidence been disclosed,

19   the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)

20   (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

21         At trial, the day after Fragola testified, Brady's counsel informed the trial court that he had

22   obtained, from Brady's family, medical records and other documents that he believed he could have

23   used to impeach Fragola if he had been aware of them sooner, and he requested that Fragola be

24   recalled to the witness stand.  In ruling on this matter, the trial court noted that the prosecution, on

25   direct examination of Fragola, did not inquire about domestic violence between Fragola and Brady.

26   Exhibit 50, pp. 16-17.  The court stated:  "For that reason I don't think all that other stuff becomes

1   discovery in this case." *Id*.  The court went on to observe that, when the defense inquired, on

2   cross-examination, into the matter of the domestic violence between Fragola and Brady, that "does

3   open the door up to contextual explanations of that domestic violence." *Id*. at 17.  The court also

4   stated about the documents brought in by defense counsel:

5       I will tell you in reviewing them I do see a lot of things that would be corroborative of
        some stuff she would say.  There's reference made to fractures of the cervical area on
6       a hospital visit.  Fractures in the lumbar area on a hospital visit.  Bruises, swelling in
        areas of the head, things of that nature."

7

8   *Id*. at 18-19.  The court stated further:  "And we're getting -- or would be getting, if I was allowing

9   you to recall Ms. Fragol[a] -- way far afield on collateral issues to start trying whether or not

10  Mr. Brady is guilty of domestic violence against her, and whether she's guilty or innocen[t] of

11  domestic violence against him." *Id*. at 19.  The trial court concluded:

12          For purposes of this case, the issue was her credibility in testifying.  I allowed
        you to challenge that some by bringing out -- rightfully so -- she has some animosity
13      against him because she went to jail for domestic violence.  And part and parcel to
        that was this was a domestic violence relationship on both sides of the fence.  And I
14      let the State bring that out, as well.

15          I think that it [was] detrimental to the State that she's up there using terms like
        broken back and broken neck, and no medical records were produced.  Most people
16      are thinking you break your neck or your back, we'd be seeing a little something else
        about it then her just making these allegations.

17
            So, basically where it is now is that her credibility is challenged by some
18      allegations that she did something to him and he did something to her, and it was kept
        within that confine.  And I think that's an appropriate confine to keep it under for this
19      trial without expanding this trial out to collateral issues and going through all these
        other things.

20
            And the other problem is the family knew she was going to be a witness.  If
21      they wanted you to have this documentation that they were aware of, then they should
        have provided it long before she took the stand and testified in the way she did
22      yesterday.

23          So the only reason to recall her would be to go into things that I don't think
        are appropriate to go into, because they're collateral to the issues in this [trial].  So I'll
24      deny the request to recall her.

25  *Id*. at 19-20.

26          Brady raised the *Brady* issue on his appeal to the Nevada Supreme Court, and that court ruled

26

1  as follows:

2          Brady also claims that the prosecution withheld evidence it could have used to
   impeach a witness. Under *Brady v. Maryland*, 373 U.S. 32, 87 (1963), a prosecutor
3  must disclose evidence favorable to the defense if the evidence is material to either
   guilt or punishment. *Lay v. State*, 116 Nev. 1185, 1194, 14 P.3d 1256, 1262 (2000)
4  (citing *Jimenez v. State*, 112 Nev. 610, 618-19, 918 P.2d 687, 692 (1996)).  In
   addition to exculpatory evidence, due process requires disclosure of evidence that
5  provides grounds for the defense to impeach the credibility of the State's witnesses.
   *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).  However, "*Brady* does not
6  require the State to disclose evidence which is available to the defendant from other
   sources, including diligent investigation by the defense." *Steese v. State*, 114 Nev.
7  479, 495, 960 P.2d 321, 331 (1998).

8          We conclude that this argument lacks merit under *Steese* because the evidence
   Brady claims the State withheld was made available by the State and was available to
9  the defense through Brady's sister.

10 Order of Affirmance, Exhibit 112, p. 5.

11        This court finds that this ruling by the Nevada Supreme Court was not contrary to, or an

12 unreasonable application of *Brady*, or any other United States Supreme Court precedent. *See*

13 28 U.S.C. § 2254(d).  And, the court further finds that the state courts' factual determinations -- that

14 the subject material was made available by the State and was available to the defense through

15 Brady's sister -- were not unreasonable in light of the evidence presented in the State court

16 proceedings. *See id*.

17        When the defense raised this issue in the trial court, the day after Fragola testified, defense

18 counsel filed the "Supplement Discovery" (Exhibit 49), which included documents he claimed were

19 improperly withheld by the prosecution, and he stated:

20        Last night about 7:00 o'clock the family members of my client provided me with
          documents that would have -- had I had them or had I been aware of their existence --
21        would have allowed me to impeach Ms. Fragol[a].

22 Exhibit 50, p. 7-8.  Plainly, that material was in the possession of Brady's family, or at least available

23 to his family, and Brady never made any showing in state court that he could not have obtained that

24 material before Fragola testified in the same manner that he obtained it on the evening after she

25 testified.  *See id*.; *see also* State's Opposition to Defendant's Motion for Mistrial or, in the

26 Alternative, Motion for New Trial, Exhibit 70, pp 8-12.  The Nevada Supreme Court reasonably

found that the subject material "was available to the defense through Brady's sister."  Order of

Affirmance, Exhibit 112, p. 5.

Regarding the other basis articulated by the Nevada Supreme Court for its ruling, the

prosecution asserted in state court that it had made available to the defense, prior to trial, documents

that Brady claims were withheld:

> The medical records had been in the State's file prior to Trial.  These medical records were in the file at the time the State's file was reviewed [on] two separate occasions by the Defendant's previous counsel, Erik Ferran, Esq.  These medical records were in the State's file at the time the State's file was reviewed on numerous occasions by the defendant's own father, Ron Brady, Sr.  These medical records were in the State's file when the State's file was reviewed by the Defendant's current counsel, Michael Schwarz, Esq.

State's Opposition to Defendant's Motion for Mistrial or, in the Alternative, Motion for New

Trial, Exhibit 70, p. 5.  Brady contests that assertion, but Brady did not, in state court make any

evidentiary showing that would render the state courts' factual determination unreasonable.

The state court reasonably found that the subject material "was made available by the State."

Order of Affirmance, Exhibit 112, p. 5.

Furthermore, this court notes the trial court's ruling that, for the most part, the subject

material would have been inadmissible as evidence at any rate.  *See* Exhibit 50, pp. 19-20.  In a

federal habeas corpus action, a federal court may not review a state court's decisions on matters of

admissibility of evidence under state rules.  *See Winzer v. Hall*, 494 F.3d 1192, 1198 (9th Cir.2007)

("State court rulings on the admissibility of evidence generally fall outside the scope of federal

habeas relief, which is designed only to remedy violations of federal law."); *see also Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions.").  To the extent that the state courts ruled the

subject material to be inadmissible at trial, that ruling is beyond the reach of this court.

The prosecution did not question Fragola at all, in the direct examination of her, regarding

domestic violence between her and Brady.  *See* Exhibit 48, pp. 190-202 (direct examination of

Fragola).  It was only on Fragola's cross-examination, by defense counsel, that Fragola was first

28

asked any question about domestic violence.  *See id*. at 202-07 (cross-examination of Fragola).  The prosecution's questioning of Fragola on that subject occurred during her redirect examination.  *See id*. at 207-12, 215-16 (redirect and further redirect examination of Fragola).  In short, the defense raised the subject.

The reason why the defense raised the subject of domestic violence in cross-examining Fragola was to attempt to impeach her by showing that she harbored animosity against Brady because he had her arrested for hitting him over the head with a bottle, and she believed that accusation to be untrue.  *See* Exhibit 48, pp. 206-07; *see also* Exhibit 50, pp. 14-15 (defense counsel commenting on why he raised the subject of domestic abuse in cross-examining Fragola, and acknowledging that he "opened the door").

In response, in the redirect examination of Fragola, the prosecution elicited testimony from Fragola showing that Brady had inflicted injuries upon her.  *See* Exhibit 48, pp. 207-12, 215-16. It is that testimony that Brady claims could have been impeached had he had the subject documents when she testified.  However, this court has examined those documents, and determines that, even if those documents had been available for defense counsel to use at trial, their impeachment value would have been minimal.  The medical records and the police reports in fact reflect that Brady did injure Fragola in the course of their domestic violence.  *See*, *e.g.*, "Supplement Discovery," Exhibit 49; Exhibit B in Support of Defendant's Motion for Mistrial or, in the Alternative, Motion for New Trial, Exhibit 67; Supplemental Exhibits E and F in Support of Defendant's Motion for Mistrial or, in the Alternative, Motion for New Trial, Exhibit 69.  Those records do not show Brady to have never injured Fragola, and they do not show Fragola to have been wholly dishonest on the stand, in her redirect examination, when she claimed he had.  At most, those documents would have allowed some opportunity for the defense to argue about the precise extent of Fragola's injuries.  But, keeping in mind the reason why the defense opened the subject of the domestic violence between

Fragola and Brady, and the nature of the responsive questioning of Fragola by the prosecution, the

1   precise extent of Fragola's injuries was of no real importance.

2       Among the documents proffered by the defense as alleged undisclosed impeachment material

3   were a notarized letter and a handwritten letter in which Fragola purported to retract accusations that

4   Brady had battered her. *See* Exhibit 49.  However, on Fragola's redirect examination, she testified as

5   follows:

6           Q.    Would you agree with me that at some point you didn't want to testify
            against him?

7

            A.    Yes.
8
            Q.    Why?
9
            A.    Because he said he would kill me.
10
    Exhibit 48, p. 215.  In light of this testimony, evidence that Fragola retracted accusations that Brady
11
    had harmed her would likely have been explainable, and would likely have been explainable in a
12
    manner that would have further undermined Brady's defense.
13
        In sum, assuming for the purpose of analysis that the subject material would have been
14
    admissible at trial to impeach Fragola's testimony in her redirect examination, this court concludes
15
    that the material would have had minimal, if any, impeachment value, and certainly would not have
16
    been such as to raise a reasonable probability of a different result at trial.  *See Cone v. Bell*, 556 U.S.
17
    449, 469-70 (2009) (Evidence is material under *Brady*, and its non-disclosure is prejudicial, "when
18
    there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding
19
    would have been different.").  Even leaving aside, for purposes of analysis, the testimony of Fragola,
20
    there was overwhelming evidence establishing Brady's guilt.  Cassim, the jail inmate with whom
21
    Brady plotted to kill witnesses, testified in detail about the plot and his communications with Brady
22
    about it; a detective listened in on telephone discussions between Cassim and Brady and testified in
23
    detail about those discussions; the detective also listened in on telephone discussions between Brady
24
    and members of his family, as well as between Brady and Titus, regarding the plot, and testified
25
    about those discussions; several incriminating telephone conversations were recorded and the
26
    recordings were played for the jury; the undercover agent who twice met with Brady and received

money from him, as well as identifying information regarding witnesses to be killed, testified

regarding those meetings; the jury saw video of Brady meeting with the undercover agent, and

delivering to her money and identifying information regarding witnesses to be killed.  Against the

backdrop of the strong evidence against him, Brady's testimony, that his discussions with Cassim did

not involve a plot to kill witnesses, was patently incredible.  Brady's testimony was also, to some

extent, in conflict with the theory of his defense, which was that he was entrapped by the police and

their informant into committing the offense of solicitation to commit murder.  And, at any rate, the

entrapment defense was thoroughly undermined by the evidence, primarily the strong evidence that

Brady had ample opportunity to withdraw from the solicitation of murder plot.

So, the evidence at trial overwhelmingly showed Brady to be guilty.  What little the defense could

have done to impeach Fragola's testimony, with the material allegedly withheld by the prosecution,

would have had no effect on the trial.  There is, in this court's view, no possibility that the material

allegedly withheld from the defense in violation of *Brady* could have altered the outcome of the trial.

In sum, this court finds that the state courts' denial of the claim asserted by Brady as

ground II of his federal habeas petition was not contrary to, or an unreasonable application of, clearly

established federal law, as determined by the Supreme Court of the United States, and the state

courts' ruling was not based on an unreasonable determination of the facts in light of the evidence

presented.  *See* 28 U.S.C. § 2254(d).  Brady does not show habeas relief to be warranted.  The court

will deny Brady's habeas petition.

Certificate of Appealability

The standard for issuance of a certificate of appealability calls for a "substantial showing

of the denial of a constitutional right."  28 U.S.C. §2253(c).  The Supreme Court interpreted

28 U.S.C. §2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the
> showing required to satisfy §2253(c) is straightforward:  The petitioner must
> demonstrate that reasonable jurists would find the district court's assessment of the
> constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79

1   (9th Cir. 2000).  The Supreme Court further illuminated the standard in *Miller-El v. Cockrell*,

2   537 U.S. 322 (2003).  The Court stated in that case:

3       We do not require petitioner to prove, before the issuance of a COA, that some jurists
        would grant the petition for habeas corpus.  Indeed, a claim can be debatable even

4       though every jurist of reason might agree, after the COA has been granted and the
        case has received full consideration, that petitioner will not prevail.  As we stated in

5       *Slack*, "[w]here a district court has rejected the constitutional claims on the merits, the
        showing required to satisfy § 2253(c) is straightforward: The petitioner must

6       demonstrate that reasonable jurists would find the district court's assessment of the
        constitutional claims debatable or wrong."

7

8   *Miller-El*, 123 S.Ct. at 1040 (quoting *Slack*, 529 U.S. at 484).

9       The court has considered the Brady's claim in ground II, with respect to whether it satisfies

10  the standard for issuance of a certificate of appeal, and the court determines that it does not.  The

11  court will deny Brady a certificate of appealability.

12      **IT IS THEREFORE ORDERED** that the Petition for Writ of Habeas Corpus (ECF No. 1)

13  is **DENIED**.

14      **IT IS FURTHER ORDERED** that the Clerk shall **ENTER JUDGMENT**

15  **ACCORDINGLY.**

16      **IT IS FURTHER ORDERED** that petitioner is **DENIED** a certificate of appealability.

17

18      Dated September 30, 2014.

19

20      _____

21      UNITED STATES DISTRICT JUDGE

22

23

24

25

26

32